IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 94-50562
_____


J. R. KOOG, Sheriff,
Val Verde County, Texas,

                                        Plaintiff-Appellant,

                      versus

UNITED STATES OF AMERICA,

                                        Defendant-Appellee.
_____

Appeal from the United States District Court for the
          Western District of Texas
_____

_____

No. 94-60518
_____


BILL McGEE, Sheriff,
Forrest County, Mississippi,

                                        Plaintiff-Appellant,
                                           Cross-Appellee,

                      versus

UNITED STATES OF AMERICA,

                                        Defendant-Appellee,
                                           Cross-Appellant.
_____

Appeals from the United States District Court for the
          Southern District of Mississippi
_____


March 21, 1996

Before JOLLY and BENAVIDES, Circuit Judges, and DUPLANTIER,[*] District Judge.

E. GRADY JOLLY, Circuit Judge:

The question presented is whether the interim provision of the Brady Handgun Violence Protection Act, 18 U.S.C. § 922(s) (Supp. V. 1993), is consistent with the United States Constitution. The interim provision requires local law enforcement officers to conduct background checks, provide written explanations of denials to prospective purchasers, and to destroy records of the local background check. These duties are imposed on the local officials until a national background check system is in place. We conclude that by imposing these duties on local officials whose offices and duties are defined by state statutes, Congress has transgressed the Tenth Amendment principle that it may not "commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." United States v. New York, ___ U.S. ___, ___, 112 S.Ct. 2408, 2428 (1992) (quotation omitted). We therefore hold that the interim duties imposed on local law enforcement officers by the Brady Act are unconstitutional. We further hold that the remainder of the interim provision, including the duties imposed on federally-licensed firearms dealers and the five-day waiting period prior to

___

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

-2-

purchasing a handgun, is severable from the invalidated duties, and thus survives this constitutional challenge.

I

A

The Brady Act is designed to prevent federally licensed firearms importers, manufacturers, and dealers from selling handguns to ineligible persons. It does so by subjecting all prospective purchasers to a waiting period of up to five days and a background check before allowing them to purchase a handgun. By November 30, 1998, a national automated system will provide the necessary verification. In the meantime, however--and this is the focus of this appeal--the Act's interim provision requires the local Chief Law Enforcement Officer ("CLEO") to perform the background check. 18 U.S.C. § 922(s)(1)(A)(i)(III),(IV). The CLEO may be the local chief of police, the local sheriff, or his equivalent or designee. 18 U.S.C. § 922(s)(8). The mandated background check by the CLEO applies only where state law does not provide for an instant background check or state-issued permit system, 18 U.S.C. § 922(s)(1)(C),(D), as is the case in twenty-four States, 59 Fed. Reg. 37534 (July 2, 1994).

This interim provision first requires federally-licensed firearms dealers to obtain the name, address, and date of birth of each prospective buyer, together with a sworn statement containing certain personal information of the buyer. 18 U.S.C. § 922(s)(1)(A)(i)(III),(IV). The dealer is then required promptly to forward

this information to the CLEO where the buyer resides.  Id.  Upon receiving the information, the CLEO must "make a reasonable effort to ascertain within 5 business days whether receipt or possession would be in violation of the law, including research in whatever State and local recordkeeping systems are available and in a national system designated by the Attorney General."  18 U.S.C. § 922(s)(2).  The dealer lawfully may sell the handgun to the prospective buyer if the CLEO notifies the dealer during the five-day period that he "has no information" that would disqualify the purchaser, or if the five-day period expires without a response from the CLEO.  18 U.S.C. § 922(s) (1)(A)(ii)(I),(II).  In certain circumscribed instances, a dealer may dispense with the background check entirely.[1]

Once the CLEO approves a particular handgun transaction, the statute requires that he destroy all records of his investigation within twenty days.  18 U.S.C. § 922(s)(6)(B).  In addition, if the CLEO disapproves of a sale, the denied applicant may demand a written explanation and the CLEO must furnish it within twenty days.  18 U.S.C. § 922(s)(6)(C).  In instances in which the CLEO provides erroneous information, which results in a denial of a firearm application, the disappointed applicant also "may bring an

---

[1]For example, a background check may not be required for dealers in certain extremely remote locations, for prospective buyers who demonstrate that they need a handgun "because of a threat" to the buyer's life or the life of a family member, and for handgun transfers pre-approved by the Secretary of the Treasury. 18 U.S.C. § 922(s)(1)(F),(B),(E).

action against the State or political subdivision responsible for providing the erroneous information."  18 U.S.C. § 925A.

B

J. R. Koog and Bill McGee, the elected sheriffs of Val Verde County, Texas, and Forrest County, Mississippi, respectively, sought declaratory and injunctive relief from the interim provision of the Brady Act.  In Koog's case, the district court upheld the Brady Act.  <u>Koog v. United States</u>, 852 F.Supp. 1376 (W.D.Tex. 1994).  Finding that "no single decision controls the entire spectrum of Tenth Amendment analysis," the court concluded that the Brady Act "resemble[d] more" the statute upheld in <u>FERC v. Mississippi</u>, 456 U.S. 742, 102 S.Ct. 2126 (1982), than the partially invalidated statute in <u>New York v. United States</u>, 112 S.Ct. 2408 (1992).  <u>Koog</u>, 852 F.Supp. at 1387-88.  In McGee's case, the court enjoined the application of the interim provision as to him.  Guided by <u>New York</u>, the court held that "Congress cannot direct and compel local sheriffs to carry out the provisions of the Brady Bill."  <u>McGee v. United States</u>, 863 F.Supp. 321 (S.D.Miss. 1994).  Koog and the United States filed notices of appeal from the respective judgments of the district courts, and we consolidated the two cases for this appeal.

C

On appeal, the sheriffs argue that the interim provision of the Act violates the Tenth Amendment by compelling them to administer the Brady Act in violation of <u>New York</u>.  <u>New York</u>, 112

-5-

S.Ct. at 2435 ("The Federal Government may not compel the States to enact or administer a federal regulatory program."). The United States defends the interim provision as an instance of "cooperative federalism." It argues that by "administer," the New York Court was referring to administrative rulemaking. Thus, the government argues that although Congress cannot require a state legislature or administrative agency to formulate policy, it may, in the spirit of cooperative federalism, require state and local government officials in this instance to implement policy decisions that have been formulated on the national level.

## II

We begin by observing that the essence of the constitutional question before us is one of means, not ends. No one disputes that Congress could have established a separate federal system of background checks, staffed by federal officers, having all the burdensome features of which the sheriffs complain--background checks, record destruction and written explanations of denials. Notwithstanding the power to act directly, Congress chose in the Brady Act to make CLEOs the exclusive agents of the federal government for conducting background checks. The issue before us is whether Congress has exceeded its authority under the Constitution, contrary to the Tenth Amendment, by ordering the implementation of federal firearms policy in this manner.

### A

#### (1)

The Tenth Amendment states that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

Although the arguments of the parties are couched in Tenth Amendment terms, the Tenth Amendment does not independently provide a substantive limitation on the powers of the United States. Instead, the Tenth Amendment simply makes plain that the federal government possesses only the powers that have been given to it by the Constitution--and no more.  See United States v. Darby, 312 U.S. 100, 61 S.Ct. 451 (1941), 112 S.Ct at 2417-18.

Nevertheless, "the Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States."  New York, 112 S.Ct. at 2418.  The Supreme Court extensively discussed such implied limitations on federal power in New York v. United States.  The parties argue, and we agree, that New York is central to the question before us.  Because New York guides our decision, we examine it in some detail.

In New York, the Supreme Court considered the constitutional authority for a variety of methods--ranging from outright coercion to conditional spending grants and threats of preemption--by which Congress may urge the States to adopt a legislative program consistent with federal directives.  There, the court invalidated one of the provisions of the Low-Level Radioactive Waste Amendments of 1985 (the "Amendments"), which ordered state governments either

to take full legal title to certain radioactive waste created by private entities, and consequently incur liability for any damage caused by the waste, <u>or</u>, alternatively, to regulate the waste according to federal mandates.  <u>New York</u>, 112 S.Ct. at 2427-28. The federal government acted beyond its constitutional powers, the Court held, because it "crossed the line distinguishing encouragement from coercion."  <u>Id.</u> at 2428.  According to the Court, the take-title provision "'directly compell[ed the States] to enact and enforce a federal regulatory program,' an outcome that has never been understood to lie within the authority conferred upon Congress by the Constitution."  <u>Id.</u> (citation omitted).

In contrast, the Court upheld the Amendments' monetary and access incentives as permissible efforts to induce a state regulatory response.  The monetary incentive permitted States to collect a surcharge on radioactive waste they received from other States, and to pay a percentage of that surcharge to the Secretary of Energy, to be held in escrow; once the States had achieved a series of milestones, it was eligible to receive a portion of the escrowed money.  <u>Id.</u> at 2425-26.  The access incentives authorized States with disposal sites within their boundaries gradually to increase the cost of access to those sites, and then to deny access altogether, to non-sited States not meeting certain federal deadlines.  <u>Id.</u> at 2427.  The Court found these incentives to be permissible because they allowed state autonomy to be preserved. Under the monetary and access incentives,

[a] State whose citizens do not wish it to attain the Act's milestones may devote its attention and its resources to issues its citizens deem more worthy; the choice remains at all times with the residents of the State, not with Congress. The State need not expend any funds, or participate in any federal program, if local residents do not view such expenditures or participation as worthwhile.

Id. Importantly, when a state's citizens decline a federal grant or choose not to regulate a particular activity despite a preemption threat, Congress is forced to act for itself and thus to "bear the expense of a federally mandated regulatory program." Id. at 2424.

The boundary between federal power and state power, the Supreme Court explained, is encased in the Constitution's structural design. The Framers devised "a Constitution that confers upon Congress the power to regulate individuals, not States." Id. at 2423. As such, Congress "lacks the power to compel the States to require or prohibit [certain] acts," id., "even where Congress has the authority under the Constitution to pass laws requiring" individuals to perform such acts, id. Thus, Congress may regulate interstate commerce directly pursuant to the Commerce Clause, but the Commerce Clause "does not authorize Congress to regulate state governments' regulation of interstate commerce." Id. The Supreme Court forcefully and emphatically concluded:

States are not mere political subdivisions of the United States. State governments are neither regional offices nor administrative agencies of the Federal Government. The positions occupied by state officials

-9-

appear nowhere on the Federal Government's most detailed organizational chart. The Constitution instead "leaves to the several States a residuary and inviolable sovereignty," The Federalist No. 39, p. 245 (C. Rossiter ed. 1961), reserved explicitly to the States by the Tenth Amendment.

Whatever the outer limits of that sovereignty may be, one thing is clear: The Federal Government may not compel the States to enact or administer a federal regulatory program.

Id. at 2424; see also U.S. Term Limits, Inc. v. Thornton, ___ U.S. ___, ___, 115 S.Ct. 1842, 1872 (1995) (Kennedy, J., concurring) (observing that the Constitution "establish[es] two orders of government, each with its own set of mutual rights and obligations to the people who sustain it and are governed by it").

The Supreme Court explained further that the "two orders of government" created by the Constitution--state and national--force each to be accountable and responsive to their respective constituencies. Id. at 2424. Each method of federal encouragement of the States blessed in New York--the carrot of conditional spending grants and the stick of preemption threats--preserve this political accountability by permitting a State to forego participation in the federal initiative. Id. It is this ability to walk away from the federal program that enables a State to maintain control over its policies, notwithstanding the conditions and constraints imposed on the States by the federal incentive.[2]

_____

[2]Even though the federal government sets the terms of participation, the States are held accountable for opting into the federal government's "all or nothing, take it or leave it" program.

Where a State chooses to participate in a federal program, the State has made a political choice for which it properly may be held accountable by its constituency.  In contrast, a federal demand that States enact a federal regulatory program strips state officials of control over state policies and diminishes the accountability of both state and federal officials.  Id.  As the Supreme Court explained:

> But where the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision. Accountability is thus diminished when, due to federal coercion, elected state officials cannot regulate in accordance with the views of the local electorate in matters not pre-empted by federal regulation.

Id.

From this rather lengthy review of New York, we derive the following guiding principles.  First, the federal government may not coerce the States into administering a federal regulatory program or into legislating according to a federal formula.  Second, the touchstone of this impermissible coercion is whether the States are precluded from rejecting the role envisioned for them by the federal government.  Third, unconstitutional coercion of the States threatens state sovereignty because it strips States of choice and control over state policies.  Fourth, and finally, federal commandeering of state governments blurs political

-11-

accountability, a democratic value protected by the principles of federalism.[3]

(2)

We now must decide whether the interim provision, when measured against New York's guiding principles, encroaches on the sovereignty of the States in violation the Tenth Amendment, either by forcing the States to administer a federal regulatory program or by compelling the States to enact state legislation according to a federal formula.

We begin by noting the conceptual difficulty presented by the Brady Act, which is not neatly categorized as either forced administration or forced legislation by the States. The Brady Act artfully skirts the "forced administration box" by issuing mandates not to the "States as States" directly--that is, not to the state legislatures or administrative agencies--but to the chief law enforcement officers of each political subdivision in the State. Thus, one might argue that Congress engaged in a certain legislative legerdemain in an attempt to fashion its will to meet

---

[3]Eight years prior to the Supreme Court's opinion in New York, Judge Wisdom succinctly summarized the principles embodied there:

> Acts that regulate "states as states" are inconsistent with the constitutional assumption of federalism, because such acts force the states to administer congressional policy judgments. In effect, such acts convert state agencies into tools of federal policy, and thereby threaten the independence of the states. The suspect character of such acts, then, is that the states are _compelled_ to carry out the federal policy.

State of Tex. v. United States, 730 F.2d 339, 356 (5th Cir. 1984) (emphasis in original).

constitutional muster. Because the Brady Act issues no directives to state officials, it is difficult to say that Congress has compelled the States to administer its new federal firearms policy. Congress, then, escapes the force of New York's bright-line prohibition that the federal government may not compel the States to "enforce a federal regulatory program" merely by casting its net in the direction of local officials rather than state employees.[4]

---

[4]We note, however, that the CLEOs' duties under the Brady Act appear to constitute "administration" of a federal regulatory scheme. The government argues that one "administers" a federal regulatory program only by making "the package of regulatory policy judgments" a legislative body or executive agency may make. Because the interim duties are "ministerial," the government asserts, the CLEO cannot be said to have administered the Brady Act functions.

We believe that this definition unreasonably restricts the meaning of "administration." Administration is commonly understood to include an action, the purpose of which is "to direct or superintend the execution, use or conduct of" something. Webster's Third New International Dictionary of the English Language, Unabridged 27 (1993). Here, the CLEOs oversee the day-to-day functions demanded by the Brady Act (background checks, record destruction, written explanations of denials), functions which presumably are performed by the CLEOs' deputies and the CLEO himself. Common sense suggests that when the CLEO oversees background checks performed by his deputies, he "superintend[s] the execution" of the interim duties.

Although the term "administration" plainly encompasses the CLEOs' oversight of the day-to-day functions required by the Brady Act, the CLEOs, if not the State qua State, fairly can be said to "administer" Congress' firearms policy even under the government's more restrictive definition. The Brady Act requires the CLEOs to make the essential policy choices raised by the Act, namely, to decide exactly how intrusive a background search to conduct. See 18 U.S.C. § 922(s)(2) (requiring the CLEO must "make a reasonable effort to ascertain within 5 business days whether receipt or possession would be in violation of the law") (emphasis added). The CLEOs, not Congress, are to gauge the intrusiveness and cost, paid with local tax dollars, of an extensive background check. And the CLEOs, not Congress, are to weigh these negatives against the extent of community support for background checks and any benefits

The Brady Act, however, does not so adroitly evade <u>New York</u>'s directive that Congress may not "commandeer[] the legislative processes of the States." <u>New York</u>, 112 S.Ct. at 2428. Concededly, Congress has not ordered the States here, as it did in <u>New York</u>, to draft and then to enact legislation according to a federal formula--or to risk a federally-mandated penalty for failing to comply. Nevertheless, Congress has presented the CLEOs's interim duties to the States as a fait accompli. The Brady Act imposes new federally-prescribed, non-discretionary tasks on actors, the CLEOs, whose offices are created by state law and whose duties are prescribed in the States' criminal codes, all without the consent or participation of the States. In the face of Congress' substantive amendment of state policies as to the proper role and duties of the CLEOs, the States are powerless to change the result.

In the discussion that follows, we measure the interim duties imposed on the CLEOs by the Brady Act against each of the principles we have discerned in <u>New York</u>. We conclude that the interim duties effectively "commandeer[] the legislative processes of the States" and, in violation of the Tenth Amendment, cross the

_____

that background checks may bring, such as increased safety to the community. In the most fundamental sense, the CLEOs are crafting a local solution to what the Brady Act recognized as a national problem. Congress, thus, foists the core policy decision raised by the Brady Act onto the CLEOs. This certainly is a regulatory policy judgment sufficient to constitute "administration" even in the government's more restricted sense of that term, especially when the CLEO can be sued for the malperformance of those duties.

line from permissible encouragement of a state regulatory response into that constitutionally forbidden territory of coercion of the sovereign States.

(a)

First, we find that the interim duties imposed on the CLEOs are tantamount to forced state legislation.  These provisions of the Act effectively bypass the state legislative process and substantively change the enacted policies of state governments. Prior to the imposition of the Brady Act, neither the Texas nor the Mississippi criminal code required CLEOs to perform the duties that the federal government imposes on them under the Act.  See TEX. REV. CIV. STAT. ANN. art. 4413(29ee) (West 1995);[5] MISS. CODE ANN. § 45-9-101(6)(b) (1993).[6]  The CLEOs' offices are created by state law, see, e.g., TEX. CRIM. PROC. CODE ANN. § 2.12 (West 1995);  MISS. CODE ANN. §§ 19-25-1 & 21-3-3 (1993), and the state criminal codes prescribe the CLEOs' duties and powers, see, e.g., TEX. CRIM. PROC. CODE ANN. § 2.13 (West 1995) (duties of peace officers); MISS. CODE ANN. § 19-25-1 et seq. (1993) (duties of sheriffs); MISS. CODE ANN. § 21-21-1 et seq. (1993) (duties of chiefs of police).  Following

---

[5]Article 4413(29ee) permits peace officers, effective January 1, 1997, to submit an affidavit requesting suspension or revocation of a concealed weapon carry permit and stating the reason the officer believes revocation or suspension is warranted.

[6]Section 45-9-101(6)(b) permits sheriffs, with compensation, to participate "at [their] discretion" in the process of issuing concealed weapon permits, by submitting a voluntary report to the state agency issuing such permits.

the Act, the federal government imposes additional duties on the CLEOs beyond those prescribed by state statute--namely, to use federally-specified law enforcement methods (i.e., background checks, destruction of records, and written explanations of denials) to execute and administer a federal policy to prevent the acquisition of handguns by disqualified individuals, a duty which is found in no state legislation.[7]  Simply put, the interim duties imposed by the Brady Act constitute an edict to CLEOs that substantively enlarges the duties and authority given the CLEOs by the States, without the States' consent or participation.  Like the take-title provision in New York, the Brady Act "offers a state government no option other than that of implementing legislation enacted by Congress."  Id. at 2429.[8]

---

[7]The Brady Act readily can be understood as amending a State's criminal code when the Act adds a new duty to those already required of the CLEO under state law, as is the case in Mississippi and Texas.  A more problematic question may arise when the State already requires its CLEOs to perform Brady-like background checks.  Although we expressly do not pass on the question, it seems to us that the discretion of such States is unconstitutionally infringed as a result of the Brady Act.  Any attempt by these States to pare back the authority of the CLEOs to perform such checks would simply have no effect given the fact that federal legislation independently authorizes and requires a federal background check.

[8]We have considered the possibility that municipalities in Mississippi and Texas may have enacted local gun control laws that enlarge the existing duties of their local law enforcement officials without seeking state legislative approval.  Although we make absolutely no judgment as to the authority of municipalities in Texas or Mississippi to enact such ordinances absent state legislation, we note that such local handgun ordinances do not implicate the federalism concerns raised by the Brady Act.  The Constitution speaks to, and we are concerned here with, legislative directives foisted upon the States from above--by the federal

-16-

Second, Congress further has encroached on Tenth Amendment principles by securing the CLEOs' participation only by coercing the States.  The Brady Act gives the States no means by which they can assist in the implementation of federal policy while leaving unchanged the duties of the CLEOs as prescribed in the States' criminal codes.[9]  The Brady Act mandates that the CLEOs act as the exclusive agents of the federal government for carrying out the interim duties.  No choice is offered.  The States may not say to Congress, "We are not interested in having state and local officials in our State, whose offices we create and duties we define, administer this federal regulatory scheme.  If you want to conduct background searches of all persons purchasing handguns, look to your own federal background checkers."[10]  Because the State

---

government--rather than those imposed upon the States from within. In the case of local ordinances, moreover, a State retains the authority to reverse the actions of the municipality by state legislation (or has contracted that authority away in granting certain local governments "home rule" powers).

[9]More precisely, the Brady Act provides the State no alternative to having the CLEOs perform the interim duties other than to adopt a local permit or background check system.  18 U.S.C. § 922 (s)(1)(D).

[10]The government maintains that "FERC makes clear that 'the Tenth Amendment does not prevent the federal government from imposing minimal duties on state executive officers,'" citing <u>FERC v. Mississippi</u>, 456 U.S. 742, 102 S.Ct. 2126 (1982), and <u>South Carolina v. Baker</u>, 485 U.S. 505, 108 S.Ct. 1355 (1988).  We find these cases inapposite.  In <u>FERC</u>, the Supreme Court upheld a federal statute that encouraged States in various ways to develop programs to combat the national energy crisis.  In <u>New York</u>, the

has no walk-away opportunity, however costly or difficult, the States are victims of impermissible federal coercion.

(c)

Third, the Brady Act further undermines state sovereignty by requiring a State to allow CLEOs to perform duties that the State obviously prefers to avoid. In a world of fixed and limited law enforcement resources, federally-mandated duties frustrate a State's ability to have CLEOs perform state-chosen responsibilities, such as the enforcement of local laws, the maintenance of jails or the transportation of criminals. Plainly, the more "federal" duties a CLEO must perform, the fewer "state"

Supreme Court explained that permissible encouragement existed in FERC because the underlying statute "require[d] only consideration of federal standards. And if a State has no utility commission, or simply stops regulating in the field, it need not even entertain the federal proposals." New York, 112 S.Ct. at 2421. Critically, the underlying statute in FERC, unlike the Brady Act, lacked anything that "directly compell[ed] the States to enact a legislative program." Id.

South Carolina v. Baker is equally inapplicable, albeit for a somewhat different reason. There, the Supreme Court upheld against a Tenth Amendment challenge a federal tax code provision that denied an income tax exemption for unregistered state bonds. The Court treated the tax provision involved "as if it directly regulated States by prohibiting outright the issuance of bearer bonds" and therefore as a "generally applicable federal regulation." Baker, 485 U.S. at 511, 514, 108 S.Ct. at 1360, 1362. In New York, the Court announced that it has no occasion to revisit Baker and other decisions, such as Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528 (1985), as they involve instances "in which Congress has subjected a State to the same legislation applicable to private parties." New York, 112 S.Ct. at 2420. In contrast, the Brady Act, like the statute at issue in New York, "concerns the circumstances under which Congress may use the States as implements of regulation; that is, whether Congress may direct or otherwise motivate the States to regulate in a particular field or a particular way." Id.

-18-

duties the CLEO has the time and resources for.  Whatever the outer limits of state sovereignty may be, it surely encompasses the right to set the duties of office for state-created officials and to regulate the internal affairs of governmental bodies.  FERC, 456 U.S. 742, 761, 102 S.Ct. 2126, 2138 (1982) ("[T]he power of the States to make decisions and set policy is what gives the State its sovereign nature.  It would follow that the ability of a state legislative . . . body--which makes decisions and sets policy for the State as a whole--to consider and promulgate regulations of its choosing must be central to a State's role in the federal system.") (citations omitted); see also Fay v. Noia, 372 U.S. 452, 466-67, 83 S.Ct. 822, 863 (1963) (Harlan, J. dissenting) ("The right of the State to regulate its own procedures governing the conduct of litigants in its courts, and its interest in supervision of those procedures, stand on the same constitutional plane as its right and interest in framing `substantive' laws governing other aspects of the conduct of those within its border.").

Indeed, Congress' bypass of state legislative processes here constitutes a greater incursion into state sovereignty than forcing the States to enact legislation:  a bypass disposes of even the pretext of minimal state discretion that is present when the federal government forces a State to employ its legislative process to achieve a particular end.  The Brady Act dispenses with the state legislature altogether and effectively enacts state legislation requiring CLEOs to perform the interim duties under the

Act, without even the nominal participation of the States' elected representatives.

(d)

Fourth, the Brady Act blurs accountability for the policy choices reflected in this legislation. The voter who must undergo a background check to purchase a handgun encounters an official whose office is created by state law and whose every duty (prior to the Brady Act) is prescribed by the State. Yet it is the national government that made the decision to subject prospective purchasers of a handgun to a waiting period of up to five days and to a background check prior to consummating the purchase. Furthermore, the Brady Act affects not only disgruntled handgun purchasers and would-be purchasers, but other individuals as well. Voters also may blame the States for the federal government's decision to spend local law enforcement funds on background checks and related paperwork rather than for matters that may be of far more local importance.

For citizens that encounter the palpable consequences of this law, Congress is nowhere to be found. Congress does not employ the CLEO, supervise his work or pay his salary; the nameplate of no federal office is on the door. But the diffusion of accountability does not end at this point. Even if the affected citizen is aware that the legislation mandating background checks springs from the national government, and then turns to the Brady Act to determine political accountability, he will find that the CLEO himself is

-20-

responsible for deciding what is a "reasonable" search. Laying this responsibility on the CLEO's political doorstep permits Congress effectively to shift "the political liability for subsidiary decisions from federal to state officials." Evan H. Caminker, State Sovereignty and Subordinary: May Congress Commandeer State Officers to Implement Federal Laws?, 95 Columbia L. Rev. 1001, 1065 (1995). Even more confusing in properly locating accountability is the fact that the prospective purchaser who is disqualified from purchasing a handgun on the basis of an erroneous background check may sue the responsible State or political subdivision. 18 U.S.C. § 925(a). In sum, we think it is clear that the implementation of federal firearms policy in this manner erodes the clear lines of political accountability that were of vital concern to the Court in New York.

(e)

Measured against New York's guiding principles, the interim duties simply will not stand up under a constitutional challenge. Although Congress here has not issued a mandate directly to the "States as States"--that is, to state legislatures or state administrative agencies--we cannot brush away Congress' attempt substantively to amend the States' criminal codes to require new federally-prescribed, non-discretionary tasks of officials whose offices and duties are created by state law. The interim provision of the Brady Act threatens the same democratic values of state sovereignty and accountability that were placed at risk by the

take-title provision in <u>New York</u>. Moreover, we believe that permitting Congress to circumvent the coercion principle by issuing commands directly to state and local officials critically diminishes the separate and sovereign dignity of the States recognized by <u>New York</u>.

(3)

We are mindful that the Ninth Circuit Court of Appeals, in concluding that the Act is constitutional, found "nothing unusually jarring to our system of federalism in the Brady Act's requirements that CLEOs . . . `make a reasonable effort to ascertain' the lawfulness of handgun purchases." <u>Mack v. United States</u>, 66 F.3d 1025, 1029 (9th Cir. 1995). For the Ninth Circuit, the interim provision is "no more remarkable than . . . the federally-imposed duties of state officers to report missing children or traffic fatalities." <u>Id.</u> at 1029-30 (citations omitted). The tasks imposed on the CLEOs are "not alien to [the CLEOs'] usual line of work, and represent minimal interference with state functions." <u>Id.</u> at 1031.

With due respect for our sister circuit and its distinguished panel of judges, we cannot agree. First, our understanding of the principles of federalism does not permit us to characterize the Brady Act as a "minimal interference with state functions." <u>Id.</u> at 1031. We do not consider it a minimal interference when a local sheriff or chief of police is offered no choice but to devote purely local manpower and monetary resources to check the

-22-

backgrounds of countless applicants for handgun purchases. In performing these federally-mandated background checks, CLEOs are required to parse "whatever State and local recordkeeping systems are available and [to check] in a national system designated by the Attorney General." 18 U.S.C. § 922(s)(2). Neither do we consider it minimal that the CLEOs must provide written explanations of denials to purchasers and destroy the records of the local background checks. 18 U.S.C. § 922(s)(6)(C). And surely the federal intrusion is not minimal when the political subdivision that employs a CLEO may be subject to suit and judgment if the CLEO, in administering purely federal legislation against his will to do so, provides erroneous information that leads to an applicant's disqualification from purchasing a handgun. 18 U.S.C. § 925(a).

Second, and more fundamentally, we cannot accept the Ninth Circuit's apparent constitutional rationale that, in any event, federal intrusions on state functions may be of little real concern when they are essentially a minimal intrusion--in effect, because "no one's boat is being seriously rocked." The Supreme Court explicitly rejected such a defense where the federal government coerces the States to legislate according to a federal formula. The Supreme Court instructed in New York:

> No matter how powerful the federal interest involved, the
> Constitution simply does not give Congress the authority
> to require the States to regulate. . . . Where a federal
> interest is sufficiently strong to cause Congress to

-23-

> legislate, it must do so directly; it may not conscript state governments as its agents.

New York, 112 S.Ct. at 2429. Because it is clear that the interim provision amounts effectively to forced legislation, and thus violates one of the most important of all principles of federalism, it does not matter "how powerful the federal interest involved" nor how much the intrusion may be downplayed.

(4)

We pause to address one final justification for the Brady Act. The government argues, and presents some evidence,[11] that the Framers contemplated that the federal government might "make use of the State officers and State regulations" in certain matters. From this evidence of the Framers' intention, the government extrapolates that the Brady Act may be justified as simply one more instance of cooperative federalism.

The sparse reference by the Framers to the possibility of shared state and federal government responsibility makes it difficult to interpret the Framers' exact intent in this respect. We nevertheless agree with Justice O'Connor that "[n]one of the [Framers'] suggestions went so far as to propose congressional control of state legislative power. The suggestions, moreover,

---

[11]The government cites The Federalist, No. 36 at 227 (Hamilton) (J. Cooke ed.) (discussing collection of taxes), and The Federalist, No. 36 at 227 (Madison) (J. Cooke ed.) ("Indeed it is extremely probable that in other instances, particularly in the organization of the judicial power, the officers of the States will be cloathed with the correspondent authority of the Union.").

-24-

seemed to assume that the States would consent to national use of their officials." FERC, 456 U.S. at 797 n.35, 102 S.Ct. at 2157 n.35 (O'Connor, J., partial concurrence and partial dissent). Intuitively, it seems to us that there can be no cooperative federalism where one party prefers not to cooperate. Neither can there be cooperative federalism where, as is the case here, one party is never given the opportunity to decide whether to cooperate.

(5)

In sum, we conclude that Congress, in directing the CLEOs to perform the interim duties prescribed in the Act, crosses the line separating encouragement from coercion and attempts to relegate the States to acting as subordinate agents of the federal government. Accordingly, we hold that the background checks, record destruction and written explanations of denials imposed on the CLEOs by the Brady Act are unconstitutional in violation of the Tenth Amendment.

III

Having determined that a portion of the interim provision of the Brady Act is invalid, we must consider whether any other part of the provision still may be given effect. As a practical matter, once the interim duties are severed, only the obligations imposed on federally-licensed firearms dealers and a five-day waiting period would remain. See, e.g., 18 U.S.C. § 922(s)(1)(A)(i)(1), (ii)(1). In arguing that the invalidated duties are inseverable from the remainder of the interim provision, the sheriffs focus

almost wholly on Congress' intent in enacting the five-day waiting period.

We again return to New York for our standard: "`Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.'" 112 S.Ct. at 2434 (quoting Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 684, 107 S.Ct. 1476, 1480 (1987)). The relevant inquiry is "whether the statute will function in a manner consistent with the intent of Congress." Alaska Airlines, 480 U.S. at 685, 107 S.Ct. at 1480 (emphasis omitted).

Where Congress itself has provided the answer to the question of severability, however, by including such a provision in the legislation, a presumption of severability arises. INS v. Chadha, 462 U.S. 923, 932, 103 S.Ct. 2764, 2774 (1983). This presumption may be overcome only by "strong evidence" that Congress would not have enacted the law without the invalidated portions of the statute. Alaska Airlines, 480 U.S. at 686, 107 S.Ct. at 1481.

We conclude, as the district court in McGee did, that a presumption of severability applies to the Brady Act. The Act amends Section 922 of Title 18 of the United States Code, which codifies the Gun Control Act of 1968. Section 928 of the Gun Control Act provides that "[i]f any provision of this chapter or the application thereof to any person or circumstance is held invalid, the remainder of the chapter and the application of such

provision to other persons not similarly situated or to other circumstances shall not be affected thereby." 18 U.S.C. § 928. This language is unambiguous and indicates Congress' intent that the validity of the Gun Control Act as a whole or in part should not hinge on the validity of any other part. We can only assume that Congress was fully aware of Section 928 when it chose to insert the Brady Act into Title 18, and that Congress intended the severability provision to apply equally to the Brady Act provisions.[12]

Moreover, the sheriffs have not provided a convincing argument that, absent the background check and related duties, Congress would have declined to enact the remainder of the interim provision. Although the provision both imposes obligations on federally-licensed firearms dealers--the constitutionality of which is not challenged--and mandates a five-day waiting period, the sheriffs focus solely on the latter in arguing for inseverability.

---

[12]The sheriffs argue that a presumption of severability does not arise because the Brady Act does not amend the Gun Control Act but instead creates a new "program." In the past, the Supreme Court has "doubted" the applicability of a severability clause in pre-existing legislation to a later act because the challenged section, "unlike many sections of the [new act] . . . does not amend provisions of . . . [the] pre-existing statute, but instead establishes a new program." Alaska Airlines, 480 U.S. at 868 n.8, 107 S.Ct. at 1481 n.8. The sheriffs' argument faces two problems. Foremost, Congress' express intention in the Brady Act was to "amend" Section 922 of Title 18. See Brady Handgun Violence Prevention Act, § 102(a)(1), Pub. L. No. 103-159, 107 Stat. 1536 (1993). In addition, the Brady Act arguably does not provide a new program but instead adds to the Gun Control Act's existing prohibitions on handgun transfers.

Specifically, the sheriffs argue that the five-day waiting period exists solely to permit the CLEO to perform a background check to verify that the transaction is not illegal. They point to the fact that the waiting period applies only where the Brady Act requires a background check to be performed, see, e.g., 18 U.S.C. § 922(s)(1)(D) (exempting States with an instant check or permit system from the background check and the waiting period), that the waiting period may be dispensed within a number of situations, see 18 U.S.C. § 922(a)(1)(A)(ii)(II),(B),(E), and that it expires with the enactment of the national instant criminal background check or in sixty months, whichever comes first, see 18 U.S.C. § 922(s)(1). Given the myriad exceptions to the waiting period, the sheriffs argue, Congress could not have intended the waiting period independently to serve as a "cooling off" period. Although we agree that these exceptions cast doubt on the notion of an independent "cooling off" period, we cannot conclude, in the light of the strong presumption of severability created by Section 928, that Congress would have failed to enact the obligations imposed on federally-licensed firearms dealers, as well as the waiting period, if the now-invalidated duties had not been included. Accordingly, we find that invalidated duties are severable from the remainder of the interim provision of the Brady Handgun Violence Protection Act.

IV

In sum, we declare that the interim duties imposed on the CLEOs by the Brady Handgun Violence Protection Act, 18 U.S.C. §

922(g), including the mandatory background checks, record destruction and written explanations of denials, are unconstitutional. We further hold that the remainder of the interim provision, including the obligations imposed on federally-licensed firearms dealers and the five-day waiting period prior to purchasing a handgun, is severable from the invalidated duties and therefore survives this constitutional attack. We thus AFFIRM the judgment in McGee v. United States and REVERSE the judgment in Kooq v. United States and REMAND Kooq for entry of judgment dismissing the complaint.

No. 94-60518 is AFFIRMED.
No. 94-50562 is REVERSED and REMANDED for entry of judgment.