**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**October 4, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 03-30648
_____

SANTE FE SNYDER CORP; OCEAN ENERGY INC; BASIN EXPLORATION INC;
SHELL OFFSHORE INC; DEVON ENERGY PRODUCTION COMPANY LP,
formerly known as Sante Fe Snyder Corp; DEVON SFS OPERATING INC;
STONE ENERGY LLC, formerly known as Basin Exploration Inc.,

Plaintiffs - Appellees,

v.

GALE NORTON, Secretary Department of Interior; REBECCA WATSON,
Assistant Secretary Land and Minerals Management, Department of Interior;
REJANE MEDINGER BURTON, Director Minerals Management Service,
Department of Interior,

Defendants - Appellants

Appeal from the United States District Court
for the Western District of Louisiana

Before JOLLY, DAVIS and JONES Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

The plaintiffs, who are lessees (the "Lessees") under offshore federal lease OCS-G 18192,
assert that the United States Department of the Interior ("Interior"), Minerals Management
Service ("MMS"), regulations implementing the Deep Water Royalty Relief Act of 1995 ("RRA")
conflict with the act itself and are unlawful. The Lessees also challenge the Interior's final agency
decision denying the Lessees royalty relief under the RRA for their lease OCS-G 18192. The
district court ruled in favor of the Lessees on the parties' cross-motions for summary judgment.

We affirm.

## I.

As stated above, the Lessees brought this action facially challenging both the regulations promulgated by the Interior pursuant to the RRA and the Interior's order denying royalty relief to the Lessees. Cross motions for summary judgment were filed. The Lessees' motion sought a declaration that the Interior's regulations at 30 C.F.R. §§ 260.112 - 260.117 violated the RRA and that OCS-G 18192 (the "Lease") is automatically entitled to royalty relief as set forth in the RRA. The Interior simply requested judgment in favor of itself.

On January 8, 2003, the district court entered judgment in favor of the Lessees. However, this judgment was issued two days before the Interior's deadline to file its reply brief. On January 23, 2003 (within 10 business days of the issuance of the January 8 Judgment), the Interior timely filed a Motion to Amend the Judgment and Memorandum in Support Thereof. The motion was based on the fact that the district court had entered a decision without the benefit of the Interior's reply brief and set forth the arguments that would have been made in the reply brief.

On March 14, 2003, the district court denied the January 23 Motion, and stated "the Memorandum Ruling and Judgment issued on January 8, 2003 will remain in effect as issued for the reasons previously stated." The Lessees contend that the Interior's 60-day appeal period began to run from this ruling and the Interior had until May 13, 2003 to file a notice of appeal.

On March 28, 2003, the Interior filed a Motion for Reconsideration of the Reformation Remedy and for Presentation of Additional Evidence Pertaining Thereto. The Interior stated that the motion was brought under Fed.R.Civ. P. 59(e). Interior argued in this motion that the January 8 Judgment's declaration that the Lease was entitled to suspension of royalties resulted in

2

a reformation of the Lease. This motion was filed within 10 business days from the entry of the March 14, 2003 Ruling on the Motion to Amend the Judgment, but more than 60 days after the entry of the January 8 Judgment.

On April 28, 2003, the district court denied the Interior's March 28, 2003 Motion. It treated the motion as a second Rule 59(e) motion and denied it on the basis that it was untimely because it was filed more than 10 days after the entry of the January 8 Judgment and because it raised issues that the Interior could have raised but did not raise before the entry of summary judgment on January 8.

In a motion transmitted on April 28, 2003 and filed on April 29, 2003, the Interior asked the district court to vacate the January 8 Judgment and issue an order recognizing the March 14 Order as the date of initial judgment in the case. The motion noted that, without the requested order, the docket sheet could be read so that March 14, 2003 would mark the date of final judgment so that the Interior would be required to file a Notice of Appeal by May 13, 2003. At the time of filing this motion the Interior was not aware that the district court had already ruled on its March 28, 2003 Motion and was concerned that if it was forced to file a notice of appeal, the district court would no longer have jurisdiction over the case to rule on that motion. The purpose of its April 29 motion was to put the Interior in the position it would have been in had the district court not ruled prematurely on the Motion for Summary Judgment.

On May 1, 2003, the district court granted the Interior's April 29 Motion. The district court noted the confusion that was created by its premature entry of judgment and treated the January 23, 2003 Motion as a Reply Brief (not a Rule 59(e) Motion), declared the March 14, 2003 judgment as final judgment, and the March 28 Motion as a timely Rule 59(e) motion. The

3

March 28 Motion was denied, not for untimeliness, but because it raised new issues. Interior appeals.

## II.

The Lessees argue first that Interior's appeal is untimely and that we have no jurisdiction over this appeal. Lessees contend that the only post-judgment motion that extended the time for appeal was Interior's January 23 Motion for Reconsideration under Rule 59(e). Lessees argue that the Interior's time for appeal began to run from March 14, 2003 - the date the court denied Interior's January 23 Motion. Under Lessee's analysis of the docket sheet, Interior's notice of appeal was required to be filed no later than May 13, 2003 (60 days after the court's March 14 denial of Interior's January 23 Motion). Thus Lessees argue that the notice of appeal filed on June 26 was untimely.

Although this argument has some technical appeal, it rests entirely on the premise that the district court was without authority to correct its docket sheet as it did in its May 1 Ruling. The Interior argues that the district court has the authority under Rule 60(b) to vacate its own judgment for reasons stated in the rule and correct its own docket. We agree. Under Rule 60(b)(1), "the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons; (1) mistake, inadvertence, surprise, or excusable neglect." Fed.R.Civ. P. 60(b)(1). The "mistake" referred to in the rule can apply to the court's own error. Oliver v. Home Indem. Co., 470 F.2d 329, 330 (5th Cir. 1972). The district court's May 1 Memorandum Ruling was clearly directed to correct the court's own "administrative error" in ruling prematurely on January 8th, creating "some confusion as to how to interpret the procedural history that has occurred in this case after that date."

4

According to Moore's Federal Practice, "the district court undoubtedly has the power to vacate a judgment in appropriate circumstances and rehear the case, and the judgment entered after rehearing is appealable in due course, although it may be in substance the same as the first." Moore's Federal Practice 3D, § 304.14[5]. The ruling on rehearing will delay the time for taking an appeal if the reason for the ruling goes to the propriety of the initial judgment and is not entered simply to give the parties a second chance to file a timely notice of appeal. Id. Although the district court did not explicitly vacate the premature January 8th ruling, it effectively did so by granting the Interior's motion and ordering that March 14, 2003 "shall be deemed to be the date on which summary judgment was granted in favor of the Plaintiffs." The district court's May 1 Ruling did address the propriety of its January 8 Ruling as well as the propriety of its subsequent rulings entered in the case. As noted above, the May 1 Ruling acknowledged that the January 8 Ruling was entered as a result of the court's own error. As a result of vacating the January 8 Ruling, the Interior's March 28 Motion was a timely Rule 59(e) motion as measured from the March 14 final judgment date. Although the district court again refused to consider Interior's contract reformation arguments raised in that motion based on its conclusion that the Interior should have raised them earlier in the litigation, the May 1 Ruling clearly allowed the district court to consider the Interior's arguments without the impediment of a finding that the motion was untimely.

The Lessees argue that this decision effectively and improperly extended the time for the Interior to file a notice of appeal. The Lessees are correct that a motion under Rule 60(b) does not "affect the finality of a judgment or suspend its operation." Fed. R. Civ. P. 60(b). If the district court had entered its May 1 Ruling after the time for appeal had run on the original

5

January 8 judgment, then the district court could not have used this procedure to enter a ruling that would extend the deadline for appeal or give the Interior a second chance to file its notice of appeal. In re Air Crash at Dallas/Fort Worth Airport, 852 F.2d 842, 844 (5th Cir., 1988). However, assuming that the January 8 judgment was the final judgment in the case, before the notice of appeal was due as calculated from that date, the district court took action to correct the mistake in its own docket sheet that it had caused by ruling prematurely on the parties cross-motions for summary judgment. Under the peculiar facts of this case, this action was within the district court's authority under Rule 60(b)(1). It did not give the Interior a renewed right to file a notice of appeal. It simply clarified which ruling to use as a starting point for determining when the notice of appeal would be due. Because the Interior filed its Notice of Appeal timely as calculated from April 28, the date the district court denied Interior's March 28 Rule 59(e) Motion, we have jurisdiction over this appeal and the Lessees Motion to Dismiss is denied.

III.

The substantive issue in this case involves the interpretation of Sections 303 and 304 of the Deep Water Royalty Relief Act of 1995. The RRA was enacted in November 1995. The RRA provides royalty relief for two categories of production from deep water leases - one for leases in existence at enactment, November 28, 1995 ("Existing Leases"), and one for leases issued in any lease sale during the five years after November 28, 1995 ("New Leases").

Existing Leases

Section 302 of the RRA, 43 U.S.C. § 1337(a)(3)(C), governs royalty relief for Existing Leases. A lessee under an Existing Lease must apply for royalty relief which may be granted or denied in the discretion of the Interior. Royalty relief is only authorized for new production. 43

6

U.S.C. § 1337(a)(3)(C)(i).  In addition, the lessee must demonstrate that "new production from such lease or unit would not be economic in the absence of the relief from the requirement to pay royalties."  43 U.S.C. § 1337(a)(3)(C)(ii)

New Leases

Sections 303 and 304 of the RRA provide royalty relief for New Leases.  Section 303 added a new subparagraph (H) to the leasing methods authorized by OCSLA's section (8)(a)(1) / 43 U.S.C. 1337 (a)(1)(H):

> The Secretary is authorized to grant to the highest responsible qualified bidder or bidders by competitive bidding, under regulations promulgated in advance, any oil and gas lease on submerged lands of the outer Continental Shelf which are not covered by [existing leases]. . . . The bidding shall be by sealed bid and, at the discretion of the Secretary, on the basis of  –
> . . .
> (H)    cash bonus bid with royalty at no less than 12 and ½ per centum fixed by the Secretary in amount or value of production saved, removed or sold, and with suspension of royalties for a period, volume, or value of production determined by the Secretary, which suspension may vary based on the price of production from the lease.

Section 304 (not codified) applies this bidding system to lease sales of New Leases and sets the minimum amount of the royalty suspension volumes.

> For all tracts located in water depths of 200 meters or greater in the Western and Central Planning Area of the Gulf of Mexico, including that portion of the Eastern Planning Area of the Gulf of Mexico encompassing whole lease blocks lying west of 87 degrees, 30 minutes West longitude, any lease sale within five years of the date of enactment of this title, shall use the bidding system authorized in section 8(a)(1)(H) of the Outer Continental Shelf Lands Act, as amended by this title [subsec. (a)(1)(H) of this section], except that the suspension of royalties shall be set at a volume of not less than the following:
> > (1) 17.5 million barrels of oil equivalent for leases in water depths of 200 to 400 meters;
> > (2) 52.5 million barrels of oil equivalent for leases in 400 to 800 meters of water; and
> > (3) 87.5 million barrels of oil equivalent for leases in water depths greater

7

than 800 meters.

The Interior promulgated regulations for administration of the RRA in January 1998. The regulation, published in 30 C.F.R. § 260.101 et seq., made suspension of royalties only available to "eligible leases." The definition of "eligible leases" encompasses all New Leases.[1] The regulation defined the term "field" to

> mean [] an area consisting of a single reservoir or multiple reservoirs all grouped on, or related to, the same general geological structural feature and/or stratigraphic trapping condition. There may be two or more reservoirs in a field that are separated vertically by intervening impervious strata, or laterally by local geologic barriers, or by both.

30 C.F.R § 260.102 (2002).

Under the regulations, when production occurs from an eligible lease, the Interior determines from what field the lease is producing and what royalty suspension volume (if any) applies to the lease. Lessees have a right to appeal the decision designating a lease as part of a particular field. If the field to which the eligible lease is assigned produced oil or gas before the enactment of the RRA, then no royalty suspension is granted (the "New Production Requirement"). The Interior concluded that under "these circumstances, Congress certainly recognized that it is not necessary to encourage production" through the use of royalty suspensions. 30 C.F.R. § 260.113(a) (2002). If the field to which the eligible lease is assigned did not produce oil or gas before the enactment of the RRA, the regulations detail how the suspension volumes are determined and allocated to the eligible leases in the field. Thus, under the Interior's regulations, New Leases only received the benefit of royalty suspension if the lease

---

[1] The regulations define an "eligible lease" as a lease that results from a sale held within 5 years of the RRA's enact ment, within the geographic area set by the act and "offered subject to a royalty suspension authorized by statute." 30 C.F.R. § 260.102 (2002).

was determined to be in a field that had not produced prior to the enactment of the RRA.

The Lessee's Lease

The Interior offered Lease OCS-G 18192 on Mississippi Canyon Block 110 as part of an area-wide lease sale held on March 5, 1997. Given the location, the water depth in which the Lease is located, and the date of the lease sale, the Lease qualifies as a "New Lease" under the RRA. Consistent with the regulations described above, the notice of sale specified that any lease issued would receive royalty suspension "only if it is in a field where no currently active lease produced oil or gas (other than test production)" before the enactment of the RRA. The notice also specified that any royalty suspension volumes would apply to fields, not individual leases.

Plaintiff Shell Offshore Inc. was the successful bidder for the Lease. The terms of the Lease mirrored the terms of the notice of sale (and the regulations) and (1) set a royalty rate, but noted that the lease was eligible for suspension of royalty payments; (2) specified that royalty suspension would only be available if the Lease was "in a field where no currently active lease produced oil or gas (other than test production)" before the enactment of the RRA; and (3) specified that royalty suspension, if available, would apply to the field where the Lease was located, not to the particular Lease. Shell signed the Lease and paid a cash bonus bid price of $3,587,000.

On June 24, 1998, the Lessees informed the Interior that they had drilled a well on the Lease and requested confirmation that the Lease was in a new field. After a preliminary ruling and a response by the Lessees, in February 2000, the Interior assigned the Lease to Mississippi Canyon 108 Field, which field contained leases that had produced prior to the enactment of the RRA. This ruling meant that under the regulations the well would not receive the benefit of

9

royalty suspension. The Lessees appealed and requested reconsideration by the MMS. On June 5, 2000, the Director affirmed. This litigation followed.

IV.

The Lessees challenge the Interior's interpretation of the RRA as set forth in various rules and regulations implementing the provision. Under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), as applied by the Fifth Circuit, the analysis of the Interior's interpretation involves two steps.

> In step one, we determine whether "Congress has directly spoke to the precise question at issue." If Congress has done so, we must "give effect to Congress's unambiguously expressed intent." If we find that the statute is ambiguous with respect to the question at issue, we proceed to step two and "the question for us is whether the agency's answer is based upon a permissible construction."

Comsat Corp. v. FCC, 250 F.3d 931, 937-38 (5th Cir. 2001)(internal citations omitted).

The question at issue is whether Section 304 of the RRA unambiguously provides that the royalty suspensions apply in full to each New Lease qualifying under its terms. The Interior argues that the statute does not unambiguously answer this question. The Interior points to the use of the words "all tracts" and "any lease sale" and "leases" as creating ambiguity as to how the royalty suspensions should apply. Section 304 establishes the royalty suspension program for new deep water leases. It states:

> For **all tracts** located in water depths of 200 meters or greater in the Western and Central Planning Area of the Gulf of Mexico, including that portion of the Eastern Planning Area of the Gulf of Mexico encompassing whole lease blocks lying west of 87 degrees, 30 minutes West longitude, **any lease sale** within five years of the date of enactment of this title, shall use the bidding system authorized in section 8(a)(1)(H) of the Outer Continental Shelf Lands Act, as amended by this title [subsec. (a)(1)(H) of this section], except that the suspension of royalties shall be set at a volume of not less than the following:
>> (1) 17.5 million barrels of oil equivalent **for leases** in water depths of 200

10

to 400 meters;
(2) 52.5 million barrels of oil equivalent for leases in 400 to 800 meters of water; and
(3) 87.5 million barrels of oil equivalent for leases in water depths greater than 800 meters.
(Emphasis added.)

Essentially, the Interior argues that because the statute uses the plural form of these terms, it is ambiguous whether the royalty suspensions granted should apply to leases or tracts grouped in some fashion or to individual leases.

The Interior noted three possible interpretations in its regulations: (1) one royalty suspension volume applied to each water-depth category in the entire area covered by the RRA; (2) one royalty suspension volume shared by all leases producing from a single field; or (3) the full royalty suspension volume for each lease. 61 Fed. Reg at 12,023. The Interior chose option (2) in its regulations. It also imposed a requirement for policy reasons that no royalty suspension would be available to leases in fields when any well in that field produced oil or gas prior to the enactment of the RRA. The rationale was that if a field is already producing, oil companies need no economic incentive to lease additional acreage in that field with the view of drilling additional wells.[2]

The district court read the statute as unambiguously providing for option (3). The district court observed that in the RRA Congress established distinct systems for royalty relief for New Leases as distinguished from Existing Leases. For Existing Leases, the RRA conditioned royalty relief on the lessee's ability to show that new production would not be economic without suspension of royalties. On the other hand, it made royalty relief for New Leases automatic under

_____

[2] A "field" is defined in geological terms and can include acreage in more than one lease tract. 30 C.F.R. § 260.102 (2002).

11

Sections 303 and 304 and did not impose a New Production Requirement for royalty relief to apply. The district court concluded that the regulations alter Congressional intent in two ways - (1) by expanding the New Production Requirement, which under the statute applies only to Existing Leases, to cover New Leases as well, and (2) by allocating royalty relief on a field basis rather than on a lease basis. The district court held that -

> Section 304 mandates that, without exception, based only on the objective factors of water depth, location of the lease block and date of the lease sale, all leases meeting these objective criteria are entitled to receive the suspensions of royalties benefit, which the Secretary may not set at a volume less than the particular volume assigned for each water depth. The statute is unambiguous on this point.

The court declined to consider whether the agency's interpretation was reasonable under Chevron and also declined to consider the agency's policy arguments, because it found the language to be unambiguous. The court concluded that the Interior's regulations violate the RRA and therefore are null and void and that the Lessees were entitled to royalty relief in the amount of 52.5 million barrels of oil equivalent (based on the depth of the Lease).

In our view, the district court's interpretation is correct. Section 304 does not speak in terms of fields. Rather, Section 304 refers to tracts and leases. The term "tract" is not defined in this statute or the related regulations, however the MMS uses the word tract to define the area covered by a specific lease. For example in a press release dated August 21, 2001, the MMS announced that "it has received 386 bids on 320 tracts offered in the Western GOM Lease Sale 180. . . . Lease Sale 180 ranks fourth in the last ten years on the number of tracts bid on." See www.gomr.mms.gov/homepg/whatsnew/newsreal/010821.html. The use of the plural term "leases" simply means that multiple leases will be granted within the large area covered by Section 304. The bidding system referred to in Section 304, established in Section 303 and codified at 43

12

U.S.C. § 1337 (a)(1)(H) speaks in terms of an individual lease.[3]

The only language that supports the Interior's position are the phrases "at the discretion of the Secretary" and "determined by the Secretary" in 43 U.S.C. § 1337 (a)(1), which includes the codification of Section 303.[4] The district court read the discretion granted in that section as being limited by Section 304 of the RRA because that provision overrides the § 1337(a)(1) discretion by specifying the minimum amount of royalty suspension to be applied on a volume basis for the class of New Leases described in Section 304.[5] We agree. This interpretation gives meaning to both sections 303 and 304 of the RRA. Section 304 requires the Interior to use the bidding system in Section 303 which includes discretionary royalty suspension "for a period, volume, or value of production determined by the Secretary." That section, however, immediately excepts and replaces Interior's discretion with a fixed royalty suspension for New Leases on a volume basis by providing, "except that the suspension of royalties shall be set at a volume of not less

---

[3] OCSLA's section (8)(a)(1) / 43 U.S.C. 1337 (a)(1)(H), reads:
The Secretary is authorized to grant to the highest responsible qualified bidder or bidders by competitive bidding, under regulations promulgated in advance, **any oil and gas lease** on submerged lands of the outer Continental Shelf which are not covered by [existing leases]. . . . The bidding shall be by sealed bid and, *at the discretion of the Secretary*, on the basis of –
. . .
(H)      cash bonus bid with royalty at no less than 12 and ½ per centum fixed by the Secretary in amount or value of production saved, removed or sold, and with suspension of royalties for a period, volume, or value of production *determined by the Secretary*, which suspension may vary based on the price of production **from the lease**.
(Emphasis added).

[4] Ibid.

[5] The district court wrote, "Although [§ 1337(a)(1)(H)] does give some discretion to the Secretary, that discretion is immediately limited by Section 304, which makes certain amounts of royalty relief mandatory for New Leases."

13

than the following" (followed by amounts which vary based on water depth). The Interior's regulation imposing a New Production Requirement on New Leases has no statutory support. Congress clearly imposed a New Production Requirement on Existing Leases. It did not do so for New Leases.

Based on our conclusion that the statutory language is unambiguous, we need not follow the Interior's suggestion to look to legislative history as a guide in interpreting the provision.

V.

Finally, the Interior argues that the district court was without jurisdiction to modify the Lease. The Lease signed by the Lessees contains the terms identical to the regulations that the district court declared inconsistent with the RRA. The district court's judgment declared that the Lease was entitled to a suspension of royalties in the amount of 52.5 million barrels of oil equivalent. The Interior asserts that this results in an invalid reformation of the Lease. The Interior argues that the Administrative Procedure Act's waiver of sovereign immunity, which is necessary for the district court and this court to have jurisdiction, does not extend to allow the district court to reform the Lease because the Tucker Act forbids reformation for contract-based claims against the United States.[6]

This argument rests on the assumption that the Lessees sued to reform its Lease. That is not the case. Rather, the Lessees were challenging the Interior's interpretation of the RRA as implemented in regulations that were contrary to Congress's statutory directive. The entire

---

[6] The Tucker Act provides that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).

14

challenge is based on statutory interpretation, not contract interpretation, and Interior did not defend the suit on the ground that the terms of the Lease superceded the RRA as interpreted in its regulations. The Tucker Act is not implicated simply because a dispute involves regulatory and statutory challenges to the Interior's attempt to collect royalties from federal leases that results in a declaration whether royalties are owed on the leases. See Shell Offshore Inc. v. Babbitt, 238 F.3d 622 (5th Cir. 2001); Diamond Shamrock Expl. Co. v. Hodel, 853 F.2d 1159 (5th Cir. 1988). Also the rule in this circuit is that if a federal lessee seeks a refund of disputed royalty payments, the Tucker Act applies. However, if the Interior orders payment of royalties and the lessee refuses to pay and instead seeks review of the Interior decision upholding the order to pay, the Tucker Act does not apply and the lessee may file suit in district court. Amoco Prod. Co. v. Lujan, 877 F.2d 1243, 1248 (5th Cir. 1989); Diamond Shamrock, 853 F.2d at 1168; Amoco Prod. Co. v. Hodel, 815 F.2d 352, 361 n.10 (5th Cir. 1987). The Lessees are not seeking a refund and for this additional reason the Tucker Act does not apply. Accordingly, the district court had jurisdiction over this case under the APA.

Also, the district court found that the Interior waived the contract reformation argument by failing to raise it until it filed its Rule 59 Motion on March 28. A Rule 59 motion "may not be used to raise arguments . . . that could reasonably have been raised or presented before the entry of judgment." 12 Moore's Fed. Prac., § 59.30[6]; Simon v. United States, 891 F.2d 1154, 1159 (5th Cir. 1990). Based on our review of the record, the district court did not abuse its discretion in rejecting this argument. Simon, 891 F.2d at 1159.

## V.

We agree with the conclusion of the district court that the regulations promulgated by the

15

Interior under the RRA related to suspensions of royalties for New Leases are inconsistent with the unambiguous language of the statute and are therefore unlawful. The Interior's final agency decision denying the Lessees suspension of royalties for their New Lease, OCS-G 18192, on the basis of those regulations cannot stand. In addition, the Interior's challenge to the district court's jurisdiction based on the Tucker Act is without merit. We therefore affirm the judgment of the district court.

AFFIRMED.