IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 12, 2009

No. 08-30069

Charles R. Fulbruge III
Clerk

KERR-MCGEE OIL AND GAS CORP

Plaintiff - Appellee

v.

UNITED STATES DEPARTMENT OF INTERIOR; C STEPHEN ALLRED,
Assistant Secretary, on behalf of Land & Minerals Management,
on behalf of United States Department of Interior

Defendants - Appellants

Appeal from the United States District Court
for the Western District of Louisiana, Lake Charles

Before KING, DENNIS, and ELROD, Circuit Judges.

KING, Circuit Judge:

The Outer Continental Shelf Deep Water Royalty Relief Act authorizes the Department of the Interior to suspend the collection of oil and gas royalties from all new and preexisting federal, deepwater leases and to impose price or volume thresholds in order to determine when royalty payments should recommence. Additionally, for new deepwater leases issued between 1996 and 2000 for specific areas in the Gulf of Mexico, the act explicitly waives all royalty payments until a specific volume of oil or gas is produced. Kerr-McGee Oil and Gas Corp. obtained eight new deepwater leases that, in addition to waivers based on volume, contained price thresholds set by the Department of the Interior. When

oil and gas prices moved above those price thresholds, the Department of the Interior sought to collect royalties on these leases, despite the fact that the congressionally set volume thresholds had not yet been met. Kerr-McGee challenged the Department of Interior's order to pay royalties in the district court, which concluded on summary judgment that the agency did not have the authority to impose price thresholds requiring the payment of royalties on volumes less than the volume thresholds set by Congress. We agree and affirm the district court's decision for the following reasons.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case are undisputed. Between 1996 and 2000, Kerr-McGee Oil and Gas Corp. ("Kerr-McGee") obtained eight deepwater, Gulf of Mexico mineral leases subject to royalty relief. These leases stipulated, however, that royalties would commence when certain price thresholds were met. Six of these leases employ the following language to impose such price thresholds:

> In any year during which the arithmetic average of the closing prices on the New York Mercantile Exchange for light sweet crude oil exceeds $28.00 per barrel, royalties on the production of oil must be paid . . . and production during such years counts toward the royalty suspension volume. In any year during which the arithmetic average of the closing prices on the New York Mercantile Exchange for natural gas exceeds $3.50 per million British thermal units, royalties on the production of natural gas must be paid . . . and production during such years counts toward the royalty suspension volume.

The remaining two leases contain substantially similar language:

> In any year during which the arithmetic average of the closing prices on the New York Mercantile Exchange (NYMEX) for light sweet crude oil exceeds $28.00 per barrel (threshold oil price), royalties on the production of oil must be paid . . . and production during such years counts toward the royalty suspension volume.
>
> In any year during which the arithmetic average of the closing prices on the NYMEX for natural gas exceeds $3.50 per million British thermal units (threshold gas price), royalties on the

2

production of natural gas must be paid . . . and production during such years counts toward the royalty suspension volume.[1]

All eight leases are additionally subject to the volume thresholds established by § 304 of the Outer Continental Shelf Deep Water Royalty Relief Act (the "DWRRA"), which states:

> For all tracts located in water depths of 200 meters or greater in the Western and Central Planning Area of the Gulf of Mexico, including that portion of the Eastern Planning Area of the Gulf of Mexico encompassing whole lease blocks lying west of 87 degrees, 30 minutes West longitude, any lease sale within five years of the date of enactment of this title, shall use the bidding system authorized in section 8(a)(1)(H) of the Outer Continental Shelf Lands Act, as amended by this title, except that the suspension of royalties shall be set at a volume of not less than the following:
>
> (1)  17.5 million barrels of oil equivalent for leases in water depths of 200 to 400 meters;
>
> (2)  52.5 million barrels of oil equivalent for leases in 400 to 800 meters of water; and
>
> (3)  87.5 million barrels of oil equivalent for leases in water depths greater than 800 meters.

Pub. L. No. 104-58, 109 Stat. 557 (uncodified, but present in a note to 43 U.S.C. § 1337).

In 2003, the average annual price of natural gas exceeded the leases' inflation-adjusted price threshold.  In 2004, the average annual prices of both oil and gas exceeded the respective price thresholds for those commodities.  Not one of the leases, however, had enjoyed production that triggered the volume thresholds imposed by § 304.

Based on the triggered price thresholds, the United States Department of the Interior ("Interior") issued a final agency order (the "Burton Decision").  The Burton Decision informed Kerr-McGee that the oil and gas price thresholds had

---

[1] Both leases adjust the triggering prices for inflation.

been exceeded, concluded that Interior had authority to suspend royalty relief based on price thresholds triggered before production exceeded § 304's volume thresholds, and directed Kerr-McGee to pay royalties.

Kerr-McGee challenged the Burton Decision in federal district court, and, on summary judgment, the court ruled that Interior did not have the authority to suspend royalty relief for production at volumes less than those established by Congress. Interior brought this timely appeal, arguing that the DWRRA does not alter the agency's discretionary authority to vary royalty relief by imposing price thresholds that suspend royalty relief before § 304's volume thresholds are exceeded.

## II. STANDARD OF REVIEW

We review de novo a grant of summary judgment, applying the same legal standards that the district court applied. Kornman & Assocs., Inc. v. United States, 527 F.3d 443, 450 (5th Cir. 2008). Summary judgment is proper when the evidence reflects "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

An agency's interpretation of its statutory authority is reviewed according to the two-step inquiry established in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Med. Ctr. Pharmacy v. Mukasey, 536 F.3d 383, 393 (5th Cir. 2008). First, we "must give effect to the unambiguously expressed intent of Congress" if Congress has, indeed, "directly spoken to the precise question at issue." Id. (internal quotation marks omitted). If we determine that the statute is ambiguous, then we proceed to Chevron's second step and "'reverse [an] agency's decision only if it [is] arbitrary, capricious, or manifestly contrary to the statute.'" Id. (quoting Tex. Coal. of Cities for Util. Issues v. FCC, 324 F.3d 802, 807 (5th Cir. 2003)) (alterations in original).

## III. DISCUSSION

Under Chevron's first step, we must consider whether Congress unambiguously granted Interior the authority to suspend royalty relief at production volumes less than those established by § 304. To interpret the statute, we begin by looking at its plain text. Wheeler v. Pilgrim's Pride Corp., 536 F.3d 455, 458 (5th Cir. 2008). The DWRRA contains three operative sections, and, because "it is a cardinal rule that a statute is to be read as a whole," In re Supreme Beef Processors, Inc., 468 F.3d 248, 253 (5th Cir. 2006) (en banc), we describe each section in turn. The first section applies only to leases in existence prior to the act's effective date and states:

> (i) [N]o royalty payments shall be due on new production . . . from any lease or unit located in water depths of 200 meters or greater in the [same geographic region of the Gulf of Mexico specified in § 304] until such volume of production as determined pursuant to clause (ii) has been produced by the lessee.

> (ii) Upon submission of a complete application by the lessee, the Secretary [of Interior] shall determine . . . whether new production from such lease or unit would be economic in the absence of the relief from [royalties] . . . . If the Secretary determines that such new production would be economic in the absence of the relief from [royalties] . . . the Secretary must determine the volume of production from the lease or unit . . . in order to make such new production economically viable; except that for new production . . . in no case will that volume be less than 17.5 million barrels of oil equivalent in water depths of 200 to 400 meters, 52.5 million barrels of oil equivalent in 400–800 meters of water, and 87.5 million barrels of oil equivalent in water depths greater than 800 meters. . . .

> \* \* \*

> (v) During the production of volumes determined pursuant to clause[] (ii) . . . in any year during which the arithmetic average of the closing prices on the New York Mercantile Exchange for light sweet crude oil exceeds $28.00 per barrel, any production of oil will be subject to royalties . . . .

> (vi) During the production of volumes determined pursuant to clause[] (ii) . . . in any year during which the arithmetic average of

> the closing prices on the New York Mercantile Exchange for natural gas exceeds $3.50 per million British thermal units, any production of natural gas will be subject to royalties . . . .

DWRRA § 302, 43 U.S.C. § 1337(a)(3)(C). The DWRRA's next section authorizes a new bidding method that Interior may use in leasing any of the submerged lands of the Outer Continental Shelf. It provides that bidding may be on the basis of a:

> cash bonus bid with royalty at no less than 12 and 1/2 per centum fixed by the Secretary in amount or value of production saved, removed, or sold, and with suspension of royalties for a period, volume, or value of production determined by the Secretary, which suspensions may vary based on the price of production from the lease . . . .

Id. § 303, 43 U.S.C. § 1337(a)(1)(H). The DWRRA's final section, set forth in full above, specifically addresses new, deepwater leases sold in a specific region of the Gulf of Mexico between 1996 and 2000. The pertinent language of that section states that "the suspension of royalties shall be set at a volume of not less than the following" specifically established volume thresholds. Id. § 304, Pub. L. No. 104-58, 109 Stat. 557 (uncodified, but present in a note to 43 U.S.C. § 1337).

Looking to Santa Fe Snyder Corp. v. Norton, 385 F.3d 884 (5th Cir. 2004), the district court concluded that Interior did not have the authority to suspend royalty relief for new leases at production volumes less than those set by Congress in § 304. In Santa Fe Snyder, we considered whether Congress granted Interior the authority to limit the application of § 304's royalty relief to only those new leases that resulted in new production from a field. Id. at 889–90.[2] Under Chevron's first step, we stated that the question was "whether

---

[2] A "field" is "an area consisting of a single reservoir or multiple reservoirs all grouped on, or related to, the same general geological structural feature and/or stratigraphic trapping condition." Id. at 889 (internal quotation marks omitted). The new production prerequisite required a lessee to show that no oil or gas had yet been produced from anywhere in the field

Section 304 of the [DW]RRA unambiguously provides that royalty suspensions apply in full to each [n]ew [l]ease qualifying under its terms," which we answered affirmatively. Id. at 890, 892. In doing so, we juxtaposed the economic justification required for existing leases to obtain royalty relief under § 302—the new production requirement—with the limited, objective requirements to obtain royalty relief for new leases under § 304—water-depth and location. See id. at 892–93 ("Congress clearly imposed a New Production Requirement on [e]xisting [l]eases. It did not do so for [n]ew [l]eases.").

The current case is the logical and inevitable extension of Santa Fe Snyder, as the district court correctly reasoned. Here, as in that case, Interior seeks to employ a royalty-relief limitation present in § 302 (which applies to leases existing prior to the DWRRA's enactment) in order to limit the royalty relief granted to new leases by § 304. Interior asserts that § 304's reference to § 303's bidding process nonetheless grants Interior the discretion to "vary" the suspension of § 304's royalty relief based on the prices of oil and gas.[3] But the plain language of the statute does not bear Interior's interpretation. Section 304 states that "the suspension of royalties shall be set at a volume not less than" the stated production volumes. Interior's reading would render § 304's mandatory language meaningless: if price thresholds trigger royalty payments before § 304's production volumes are exceeded, then the royalty payment suspension is being set at a volume less than § 304's specified production levels.

---

before obtaining royalty relief. See id. at 889–90.

[3] We note that, below, Interior raised the affirmative defense that Kerr-McGee should be estopped from challenging the legality of the price thresholds because the company bid on and signed leases containing these provisions. The district court ruled that this defense was unavailable because government officials cannot enforce by estoppel a contract that they were not legally authorized to make. See LaBarge Prods., Inc. v. West, 46 F.3d 1547, 1552 (Fed. Cir. 1995). In its briefs to this court, Interior does not contend that any such affirmative defense applies; therefore, it has abandoned this argument. See Fuzy v. S&B Eng'rs & Constructors, Ltd., 332 F.3d 301, 302 (5th Cir. 2003).

While § 303 grants Interior discretion to "vary" royalty relief for all new leases of submerged lands on the Outer Continental Shelf based on the price of production, § 304 "immediately excepts and replaces Interior's discretion with a fixed royalty suspension for [n]ew [l]eases on a volume basis" where those new leases are located in the geographic region specified by § 304. Id. at 892. Had Congress intended to impose price thresholds on the royalty relief for these new leases, it certainly knew how to do so. See, e.g., DWRRA § 302 (specifically setting price thresholds on royalty relief for existing leases that qualify for royalty relief); see also Royalty Relief for American Consumers Act of 2006, H.R. 4749, 109th Cong. § 2(a) (2006) (proposed legislation seeking to suspend all royalty relief if specified price thresholds are met). However, Congress refrained from specifically establishing such price thresholds, and we refuse Interior's invitation to read this royalty-relief limitation into the statute.

Thus, the plain language of § 304 dictates our conclusion in this case just as it did in Santa Fe Snyder. The statement that "the suspension of royalties shall be set at a volume not less than" the specific production levels means just that: royalty payments shall be suspended up to the production volumes established by Congress. Section 304 is unambiguous in this regard, and it does not grant Interior the authority to impose price thresholds that suspend royalty relief at production volumes less than those established by Congress in § 304. Therefore, we need not extend our analysis to Chevron's second step.

Finally, Interior makes the same argument that it made in Santa Fe Snyder regarding the DWRRA's legislative history. See Federal Defendants-Appellants' Opening Brief at 27–29, Santa Fe Snyder, 385 F.3d 884 (No. 03-30648); Federal Defendants-Appellants' Reply Brief at 14–16, Santa Fe Snyder, 385 F.3d 884 (No. 03-30648). Kerr-McGee points to competing passages in the legislative history in support of its position. But as we stated in Santa Fe Snyder, "[b]ased on our conclusion that the statutory language is unambiguous,

8

we need not follow the Interior's suggestion to look to legislative history as a guide in interpreting the [statute]." 385 F.3d at 893.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.